### State v. Carsonie
*[Cite as 5 AOA 114]*

*Case No. 89 C.A. 90*
*Mahoning County, (7th)*
*Decided August 2, 1990*

*James A. Philomena, Prosecuting Attorney, Kathi L. McNabb, Asst. Prosecuting Attorney, Mahoning County Courthouse, Youngstown, Ohio 44503, for Plaintiff-Appellee.*

*Mary Jane Stephens, 7330 Market Street, Youngstown, Ohio 44512, John M. Durkin, 14 Boardman-Poland Road, Youngstown, Ohio 44513-3965, for Defendant-Appellant.*

O'NEILL, P.J.

Following trial, a jury returned a verdict finding that "*** upon due deliberation a verdict of not guilty of involuntary manslaughter, R.C. 2903.04(B), and guilty of aggravated vehicular homicide, R.C. 2903.06(A)(b). The jury also found the defendant did cause physical harm to Natalia Carsonie and was under the influence of alcohol at the time the offense was committed. The defendant-appellant was sentenced for a minimum term of 2 1/2 years and a maximum term of 5 years. A timely notice of appeal was filed from this sentence.

The first assignment of error contends that the trial court erred in failing to suppress evidence of defendant's blood test when the sample was taken in violation of the procedures mandated by the director of health for the collection and handling of blood and urine specimens.

Prior to trial, the defendant-appellant filed a motion *in limine* requesting the court to issue an order prohibiting the State of Ohio from introducing into evidence any and all tests, scientific or otherwise, that may have been performed on the appellant and to further prohibit the introduction of any and all references or evidence as to any of the defendant's body fluids,

including blood or blood samples, taken from the appellant on or about January 16, 1988. The defendant-appellant also filed a motion to suppress requesting the trial court to suppress the results of a blood alcohol test performed by the Tri-State Laboratories. These motions were not ruled upon by the trial court prior to trial. No attempt was made by the appellant requesting the court to rule on such motions prior to trial or during trial.

The decedent in this case was killed as the result of an auto accident which occurred while the defendant-appellant was operating an automobile in which the decedent was a passenger. Shortly after the accident, a doctor at a local hospital, upon the request of a policeman, removed blood from the defendant-appellant and that sample was forwarded to a laboratory which performed an alcohol analysis and a drug screen. A representative of the laboratory testified that, as a result of an examination of the blood, it was determined that the blood alcohol was 0.159 per cent ethanol which means 159 milligrams ethanol per 100 milliliters of blood.

R.C. 2903.06(A) reads as follows:

"No person, while operating or participating in the operation of a motor vehicle, motorcycle, snowmobile, locomotive, watercraft, or aircraft, shall recklessly cause the death of another."

The foregoing statute continues on to read as follows:

"(B) ***

"When the trier of fact determines whether the offender was under the influence of alcohol or any drug of abuse, or the combined influence of alcohol or any drug of abuse, the concentration of alcohol in the offender's blood, breath, or urine as shown by a chemical test taken pursuant to section 1547.111 or 4511.191 of the Revised Code may be considered as competent evidence and the offender shall be presumed to have been under the influence of alcohol if there was at the time the bodily substance was withdrawn for the chemical test a concentration of ten-hundredths of one per cent or more by weight of alcohol in the offender's blood, ten-hundredths of one gram or more by weight of alcohol per two hundred ten liters of his breath, or fourteen-hundredths of one gram or more by weight of alcohol per one hundred milliliters of his urine."

R.C. 4511.19 provides for the admission of evidence on the concentration of alcohol in a defendant's blood. That statute goes on to state that the blood, which is the basis for the analysis, "*** shall be analyzed in accordance with meth-ods approved by the director of health by an individual possessing a valid permit issued by the director of health pursuant to section 3701.143 of the Revised Code." R.C. III 4511.191 essentially provides that any person operating a motor vehicle upon the public highways in the State of Ohio is deemed III, to have given consent to a chemical test of his blood. R.C. 1547.111 deals with the operation of watercraft and has no application to this case.

Obviously, the prosecution introduced the result of the blood test performed upon the defendant-appellant so as to take advantage of the presumption that, at the time of the accident, the defendant-appellant had been under the influence of alcohol.

A medical doctor testified that it was he who had originally withdrawn the blood of the appellant. During direct examination, the doctor, was questioned as to how and what procedure he used in withdrawing the defendant-appellant's blood.

"Q. Okay when you are drawing, for alcohol, alcohol, what are you trained to swab with or to sterilize with?

"A. It's a small packet. It contains -- as a matter of fact, I have one, if I can how (sic) that:

"MR. GESSNER: Yes.

"THE COURT: Go ahead

"A (Continuing) This is essentially the packet we use. It's a 2-ply, a medium alcohol prep, just open it up, it is sterile, take this out, and this has or contains 70 percent alcohol, isopropyl alcohol.

"Q. Are there any other methods you would use?

"A. Other methods you can use, use an antiseptic, a betadine preparation, contains iodine.

"Q. It does not contain alcohol?

"A. No, it does not; to my knowledge, no.

"Q. If you were testing for alcohol, which of the two would you use?

"A. The best one probably to use would be the betadine, use the betadine." (Tr.83-84).

During cross-examination, the following dialogue took place:

"Q. There are two different types of solutions you may purify the skin with?

"A. Right.

"Q. What solution did you use to put the catheter in?

"A. Being that it was 16 months ago, I cannot recall with 100 per cent surety what I used at that point in time.

"Q. You could have used alcohol?

"A. I could have used alcohol; I could have used betadine." (Tr. 90).

One of the regulations promulgated by the director of health appears in the Ohio Administrative Code at section 3701-53-05, Subsection B and reads as follows:

"The blood samples shall be collected by a physician, registered nurse, or a qualified technician or chemist. An aqueous solution of nonvolatile antiseptic shall be used on the skin. Alcohol or phenol shall not be used as a skin antiseptic"

There was no evidence presented as to just what antiseptic the doctor used. However, when the doctor was asked what he generally used to swab with or sterilize with, he identified it as a package containing a medium alcohol prep. (Tr. 83).

The doctor was asked, under cross-examination:

"Q. Okay. When you placed the blood into the container, did you seal the container. Did you put any tape on it?

"A. To tell you the truth, I cannot recall whether I did or not." (Tr. 91).

O.A.C. 3701-53-05-Sec. E, relating to the subject test, provides as follows:

"Blood and urine container shall be sealed with a gummed tape or sticker which contains at least the following information:

"(1) Name of suspect;

"(2) Arrest or slate numbers;

"(3) Date and time of collection;

"(4) Name or initials of persons electing and or sealing sample."

During cross-examination, the further following dialogue took place:

"Q. Doctor, the last thing I'm going to ask you, are you also aware of the fact that the container that you placed the blood into, the exhibit there, has to contain a preservative, an anticoagulant?

"A. That I was not aware of. We did call the lab to check to see what type of tube to inject the blood into. At that time I was told a red-top tube. Subsequently, that is why I used a red-top tube.

"Q. The red-top tube used didn't contain that?

"A. It did not.

"Q. Consequently, it didn't meet the specifications of the State of Ohio, did it?

"A. Apparently not." (Tr. 97-98).

O.A.C. 3701-53-05 provides, in pertinent part, as follows:

"(A) All samples shall be collected in accordance with Section 4511.19 of the Revised Code. "***

"(C) Blood shall be drawn with a: "(1) Sterile dry needle into a vacuum container containing a solid anticoagulant; or (2) sterile dry needle and syringe and deposited into a clean container containing a solid anticoagulant and the container shall then be capped or stoppered."

It is obvious, from the foregoing dialogue, that the blood sample withdrawn from the defendant-appellant did not comply with the regulations established by the state director of health. It was not competent evidence due to this failure.R.C. 2903.06 provides that the concentration of alcohol in an offender's blood may be considered as competent evidence if that concentration is shown by a chemical test taken pursuant to R.C. 4511.191. Thus, the competency of that evidence is dependent upon proof that the chemical result was arrived at by a chemical test taken pursuant to regulations of the director of health.

"When an item of evidence offered is dependent upon the existence of some other fact, that preliminary fact should be first proven. 42 Ohio Jurisprudence 3d 452, Evidence and Witnesses, Sec. 183.

The state failed to prove the existence of the preliminary fact, to-wit: that the test of the defendant-appellant's blood was performed pursuant to regulations of the director of health. As such, the result of that blood test was incompetent evidence. However, there was never any objection raised at trial by the defendant-appellant as to the admissibility of the foregoing evidence. In general the failure to object, at the first instance, as to error is considered to be a waiver of that error. Ohio Rule of Criminal Procedure 52(B) provides:

"Plain error. Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

The evidence, which is the subject of this assignment of error, and, further, the instruction given by the trial judge in relation to the application of this evidence,had heavy impact upon the jurors and, without question, to a great extent led the jurors to their verdict. In the case of *State v. Long* (1978), 53 Ohio St. 2d 91, the Supreme Court, in discussing the plain error rule, gave definition to it wherein the court stated that error "*** does not constitute a plain error or defect under Crim. R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise." (p.97).

There were three other lay witnesses presented by the state, each of whom testified that, in their opinion and based upon their observations, the defendant-appellant, at the time of this accident, was under the influence of alcohol and incapable of driving in a safe manner. (See testimony of Basilissa Hepburn, Robert Hepburn and Marcia Anthony). An essential element of the crime within which the defendant was charged is the reckless causation of the death of another.

"Evidence that the defendant was driving under the influence of alcohol is sufficient to support a finding of recklessness." *State v. Stinson* (1984), 21 Ohio App. 3d 14, Syllabus 2.

We recognize that the three subject witnesses were lay persons. However, upon a review of their testimony, it is our conclusion that their opinions were acceptable, especially that opinion of Robert Hepburn, who identified himself as a recovering alcoholic.

"*** An opinion by any person concerning the lack of sobriety of a defendant is admissible in evidence without the witness first being qualified as an expert, so long as that person in all probability has had sufficient experience with intoxicated persons to be qualified to form and express an opinion and has had an opportunity to observe the defendant." *Toledo v. Starks* (1971), 25 Ohio App. 2d 162, 167.

In view of this other evidence, it is our conclusion that the admission of the result of the blood test, although erroneous, did not, in and of itself, prejudicially cause an incorrect verdict.

This first assignment of error is found to be without merit.

Assignment of error number two complains that the court erred by excluding an expert witness called by the defendant-appellant.

Upon a review of the evidence presented by the 1 defendant-appellant, it was very obvious that he was attempting to prove to the jury that the automobile accident, which resulted in the death of the decedent, was caused by the decedent. In his testimony, the defendant-appellant testified that, while he was operating the car, decedent was almost hysterical and that she, in fact, wrenched the steering wheel from his hands and caused the accident which resulted in her death. In pursuit of this defense, the plaintiff-appellant presented a witness, Dr. Robert H. Loiselle, a clinical psychologist. During direct examination, it was established that Dr. Loiselle had examined the decedent on September 8, 1983. At that point, an objection was raised and the judge, the reporter, counsel and the doctor retired to chambers. The defendant-appellant proceeded with his direct examination of the expert witness. Based upon his one examination, in 1983, the doctor rendered an opinion that it was his assessment that the decedent was suffering from a post-traumatic stress disorder and that her makeup was that of what was then called hysteria personality. Upon cross-examination, the doctor was asked if he had any opinion as to the decedent's condition in 1988. His answer to that was "Well, I have an opinion in the sense that personality or psychological traits are very consistent changes in one's personality and not likely to change. Her post-traumatic disorder was well resolved by then and any depression she had by then was well resolved by then." Counsel for the defendant-appellant then asked the doctor: "Can you state that she suffered from that condition as of January 1988?" At that point the trial judge stated to all concerned "I'm not going to permit this testimony." (Tr. 349). In chambers, discussing the proposed testimony of the doctor, the trial judge stated that his testimony "*** is so remote in time" and went on to state "*** I don't see how this can ever come in." (Tr. 346).

The calling of expert testimony in the extent to which such testimony an opinion evidence may be received rests largely in the discretion of the trial court. *Bostic v. Connor* (1988), 37 Ohio St. 3d 144.

Obviously, what was bothering the trial judge was the fact that the expert called by the defendant-appellant had not seen nor examined the decedent for five (5) years. He was not aware if she had received any other medical help and there was no way that he was aware of her condition at the time of the accident.

"Where evidence relates to matters too remote in point of time or to matters too far removed from the scene of the transaction, it is not admissible."29 American Jurisprudence 2d 305, Evidence, Sec. 253.

We find no error in the ruling by the trial judge barring and excluding the expert opinion of Dr. Loiselle.

Accordingly, the second assignment of error is overruled.

*Judgment affirmed.*

DONOFRIO, J., COX, J., concur.